UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | CRIMINAL NO. 18CR10393-GAO |
| ) | |
| YAT KUEN CHAN ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Yat Kuen Chan respectfully submits this memorandum in aid of sentencing.

I.      Proceedings to Date

On October 8, 2019, Mr. Chan pled guilty to a three-count superseding information. Count one charged conspiracy to pay unlawful gratuity and to bribe a public official, in violation of 18 U.S.C. § 371; count 2 charged unlawful gratuities to a public official, in violation of 18 U.S.C. § 20l(c)(l)(a); and count 3 charged bribery of a public official, in violation of 18 U.S.C. § 20l(b)(l).

Probation and Pretrial Services records indicate that he has complied with all court-ordered conditions of release.

Sentencing is scheduled for May 26, 2020.

II.     The Guideline Calculation

The Probation Office and defendant agree to the following calculation: The three counts of the indictment are grouped for guideline calculation purposes, see USSG §3Dl.2(d), with a base offense level of 12, see USSG §2Cl.l(a)(2), reduced by 2 for acceptance of responsibility, so a Total Offense Level of 10. With a criminal history score of zero, the guideline is in Zone B of the guidelines, which makes a sentence of probation an available sentence. USSG §5B1.1.

The government differs, arguing for a two-point enhancement, saying that the payments were not installment payments for a single action and therefore constituted multiple bribes. One

notes that the bribery was charged in a single count; the objective identified in each payment was to avoid the buses being put "out of service," a single objective. The government insists, however, that the payments were not "installments" and, as such, considered separate payments. However, installment payments are an example of "related payments," not the single criterion. The application note to section 2C1.1 makes plain that "related payments" can be a "single incident," specifically that "related payments that, in essence, constituted a single incident of bribery . . . (e.g., a number of installment payments for a single action) are to be treated as a single bribe …, even if charged in separate counts." U.S.S.G. § 2C1.1(b)(1), comment. (n.6).

      The Probation Department persuasively contests the government's argument:

> The Probation Office takes the position that on July 30, 2018, when Alfred is first presented with the money, Chan indicates that the payment is "helping out the company" which entails getting the out of service order lifted and looking over any violations that would result in hefty fines and/or violations that would put the business out of service. Each one of the bribes made were as related to the FMCSA's new entrant registration, which is an 18-month New Entrant Period, in which the New Entrant must: operate safely, maintain up-to-date records; conduct periodic inspections and perform maintenance on commercial motor vehicles; and pass the Safety Audit. Therefore, the payments made on August 1 and August 13 were not distinct bribes designed to influence different transaction; rather, they were related payments designed to influence one particular matter (i.e. FMCSA's new entrant registration).

PSR at p. 24-25.

      The government cites several cases, each regarding multiple bribes for multiple purposes and each for that reason is inapposite. In United States v. Atshad, 239 F.3d 276, 280-81 (2d Cir. 2001), a contractor who received a $ 300,000 contract to paint public housing units in New York sought to bribe the state inspector for three purposes: to overlook deficient performance, to authorize additional work hours, and to expedite approval of payment for Arshad's completed work. Id. at 280-81. In an unpublished opinion, United States v. Weaver, 175 Fed. Appx. 506, 510 (3d Cir. 2006), the defendant had agreed to receive kickbacks in his role as a school district's director of information technology in connection with the delivery of computers to his district, an arrangement which continued over a year, involved phony invoices, an additional

payment of $500,000 for which no invoice was prepared, and 13 payments for oversight over the performance of a contract for computers which were priced to the district over 400% over market price. In United States v. Kahlon, 38 F.3d 467, 470 (9th Cir.1994), the defendant "made payments to promote different applications for work papers on" on diverse dates, as well as payments by others on different dates as part of the same conspiracy. The opinion itself, sparse of details, offers no meaning to the words "work papers;" it does, however, deal with multiple bribes for multiple purposes over extended time, so it is of little use here.

  The payments here were "related," in that each was part of a continuum, with each offered in response to a new impediment placed by the undercover inspector on the roadworthiness of the buses.  A more savvy "briber" might have asked for an assurance of a final price, and not be led about by a fellow who "ups the ante," saying, in effect, <<hold on a moment-- we got another problem over here….>>. In no real sense were the objectives for each payment separate; a bribe was offered to keep the buses on the road, a single action however finely the government may slice it, with the cooperating individual increasing the amount several times. The inspector's "reasons" for each request were merely efforts to exact more money and make culpability more evident, and did not reflect independent objectives of defendants.

  III.  Personal History

  Mr. Chan, now 43, is a U.S. citizen born in Canton Province, China and raised by his married parents. Life in China was hard as their circumstances were trying: little money or clothing and no utilities. Hoping for a better life for their family, his parents in November 1987 brought him and his two siblings to the U.S. He was 11 at the time; the family moved in with an uncle in New York's Chinatown.  He attended school at the Seward Park High School in Manhattan's Lower East Side, leaving in the 10th grade. He had learning difficulties and

challenges; he learned basic reading but never felt at ease in the classroom. Thereafter, he persisted, taking GED classes for 2 years but not a 3d year, and never earned his GED. He became naturalized at age 18.

He married and lived with his wife in Brooklyn. The marriage was arranged and lasted 13 years. He and his wife moved to Massachusetts in approximately 2007. The couple had two children, now 13 and 7. In 2017, they separated and 2 years later divorced. They share joint custody of the children; he pays child support, including for his daughter's schooling.

While in New York, in the period of 2004-06, he volunteered about 10 hours per week as an auxiliary police officer, part of NYPD's auxiliary police program. Volunteer officers are trained to assist in non-enforcement and non-hazardous duties, including patrolling subway stations and housing projects. A photograph taken during his volunteer work is below:



His life-long employment has been as a driver, first of a delivery truck in New York, and, upon moving to Massachusetts, as a bus driver and office clerk. He is described by his current

employer, which runs local tours, as "a responsible worker … who is never late for work." He earns modestly more than the minimum wage.

His father is deceased; his mother continues to live in Chinatown with his sister. His brother lives in Philadelphia.

IV.     There is no Risk of Recidivism

Mr. Chan is in Criminal History Category I, with no criminal history.  A 2016 Sentencing Commission study found that first-time offenders pose the lowest risk of recidivism. U.S.S.C., "Recidivism Among Federal Offenders: A Comprehensive Overview," at 18 (2016) ("Recidivism"), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivismoverview.pdf. Offenders with zero criminal history points were rearrested 30.2% of the time within 8 years, compared to 81.5% of offenders with more than 10 criminal history points. Id. The 2016 study, however, did not isolate out all true first-offenders, since it treated all offenders with zero criminal history points the same, lumping together those with no arrests, those with minor convictions not scored, and those with timed out convictions. A 2004 Sentencing Commission study specifically considered the 24-month recidivism rate for offenders with no prior arrests of any kind. That study found that only 6.8% of offenders with no prior arrests were rearrested within 24 months. U.S.S.C., "Recidivism and the 'First Offender'", p. 14, available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf. (May 2004). The reconviction rate for such offenders was only 2.5%. Id. See http://www.ussc.gov/guidelines/amendments/proposed-2017-amendments-federal-sentencing-guidelines.

In its proposed changes in 2017, albeit not enacted, the Commission proposed to differentiate among persons in Criminal History Category I to ensure reduced sentences for genuine "first offenders," that is "first time offenders with no prior convictions." As to those, such as Mr. Chan here, the Commission proposed a new guideline, at §4C1.1 (First Offenders), that would have provided lower guideline ranges, premised on data showing that "first offenders" generally pose the lowest risk of recidivism. See U.S. Sent. Comm'n, Proposed 2017 Amendments to the Federal Sentencing Guidelines (Dec. 19, 2016 and August 24, 2017), 82 FR 40651, and U.S. Sent. Comm'n, "Recidivism Among Federal Offenders: A Comprehensive Overview," at 18 (March 2016), available at http://www.ussc.gov/research/research-publications/recidivism-among-federal-offenders-comprehensive-overview. This data is reinforced by another Commission study, entitled "The Effects of Aging on Recidivism Among Federal Offenders" (Dec. 7, 2017), available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

The persuasive force of the data suggests that the need for specific deterrence is lessened, and with it the need for added severity in sentencing, where the defendant is, as here, a genuine first offender.

V.      The Guidelines: National Trends

Nationally, the rate of within-guideline sentences has consistently remained at or below 50% for much of the past decade, at 52% in FY2012, to 51% in FY2013, to 46% in FY2014, to 47.3% in FY2015, to 48.6% in FY2016, to 49.1 in FY2017, and to 51.4 in FY 2019. See, e.g., USSC, Comparison Of Sentence Imposed And Position Relative To The Guideline Range, Table 29, FY 2019. In this District, the rate has been well below 50%, from 43% in FY2012, to 39% in

2013, to 23% in FY2014, to 25% in FY2015, to 27.5% in FY2016, to 31% in FY2017 and to 37.2% in FY 2019. See Statistical Information Packet, Fiscal Year 2019, District of Massachusetts.

VI. The Court Should Consider the Possible Consequences of Incarceration in View of the COVID-19 Outbreak

The novel coronavirus that causes COVID-19 has led to a global pandemic. As of May 6, more than three million cases and more than 260,000 deaths had been reported worldwide, while the United States has more than one million cases and more than 70,000 deaths.[1] Projections range from 100,000 to 200,000 deaths in the United States in the best case scenario, to as many as 1.5 million deaths in the most severe scenario.[2]

The spread of the virus within federal prisons has far outpaced its growth in the population as a whole, as reflected in the chart below, compiled by the Federal Defender for the Southern and Eastern Districts of New York, based on data available through the Bureau of Prisons and the Centers for Disease Control. https://federaldefendersny.org/. There is ample reason to believe that the infection report for the Bureau of Prisons is a fraction of the actual rate of infection, given the absence of widespread testing. Nevertheless, it is nearly four times higher than in the general population.

---

[1] https://www.cnn.com/interactive/2020/health/coronavirus-maps-and-cases/ (last visited May 6, 2020); https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 6, 2020). These numbers rise significantly every day.

[2] See *Dr. Deborah Birx Predicts Up To 200,000 Deaths "If We Do Things Almost Perfectly"* NBC News, Mar. 30, 2020 https://www.nbcnews.com/news/us-news/dr-deborah-birx-predicts-200-000-deaths-if-we-do-n1171876 ;  Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, New York Times (Mar. 13, 2020) https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html



The World Health Organization and Centers for Disease Control have issued guidelines to help prevent the spread of the virus. Virtually all of the precautionary measures require keeping people out of crowded places and maintaining "social distancing" to lessen the spread of the virus, which passes through coughing and by contact with surfaces. It "can remain viable and infectious in aerosols for hours and on surfaces up to days."[3] For the most part, inmates cannot follow the recommended measures for mitigating the spread of COVID-19. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases, especially those passed by droplets through coughing and sneezing. Current CDC recommendations include maintaining a distance of at least six feet from every other person.[4] Prisoners must share

---

[3] Neeltje van Doremalen, et. al, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Med., (March 17, 2020), available at nejm.org/doi/10.1056/NEJMc2004973.

[4] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at

sleeping areas, dining halls, bathrooms, showers and other common areas. In addition, inmates have reduced opportunities to apply necessary hygiene measures, as jails and prisons are often under resourced and ill equipped.

The federal prison system is a hot spot for the disease, as many voices in Congress have recognized.[5] Our nation's jails and prison systems do not provide adequate medical care in the best of times, and the federal system is no exception.[6] As of May 6, 2020, 42 federal inmates

---

https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf. See also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

[5] Legislators have been calling on the Department of Justice to "do all they can to release as many people as possible who are currently behind bars and at risk of getting sick." *See* March 19, 2020 Letter from U.S. Reps. Jerrold Nadler & Karen Bass to Attorney General William P Barr ("With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action."); *see also* March 19, 2020 Letter from Senator Kathleen Harris to BOP Director Michael Carvajal (noting that "[e]merging research has demonstrated how dangerous coronavirus is for the elderly and those with underlying conditions and compromised immune systems" and urging BOP to "tak[e] reasonable steps to reduce the incarcerated population and guard against potential exposure to coronavirus") Available at https://www.harris.senate.gov/imo/media/doc/Harris%20Letter%20to%20Carvajal%20(3.19).pdf

[6] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists.); David Patton, *Statement from Federal Defenders of New York*, Federal Defenders of New York (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html.

within the BOP system had died from the disease.[7] Within 12 days, the death counts increased to 57 deaths. As of May 18, 2020, the BOP website reported:

> There are 2338 federal inmates and 196 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 1971 inmates and 375 staff have recovered. There have been 57 federal inmate deaths and 0 BOP staff member deaths attributed to COVID-19 disease.[8]

These numbers likely underestimate the scope of the spread within BOP, as testing is not generally available. A union representing BOP staff filed an "imminent danger report" with the United States Department of Labor Occupational Safety and Health Administration ("OSHA") alleging that the BOP is engaging in actions which are proliferating the spread of COVID-19 including a) directing staff who have come into contact with individuals who show systems of COVID-19 to report to work and not self-quarantine; failing to introduce workplace controls to mitigate or prevent exposure or further exposure to the virus; failing to modify operations to minimize contact; and failing to provide staff with the proper masks to staff. *See* Joe Davidson, *Unions for Prison, VA Workers File 'Imminent Danger" Reports about Coronavirus Condition*s, Washington Post, (Apr. 9, 2020).[9] The danger extends not only to BOP institutions but also to half-way houses/residential reentry centers (RRC).[10]

---

[7] *See* Keegan Hamilton, *Third Inmate Dies from COVID-19 at Louisiana Prison as Entire Federal System Goes on Lockdown*, Vice News (Apr. 2, 2020) available at https://www.vice.com/en_us/article/5dmend/second-inmate-dies-from-covid-19-at-louisiana-prison-as-entire-federal-system-goes-on-lockdown  *See also* Kimberly Kindy, An Explosion of Coronavirus Cases Cripples a Federal Prison in Louisiana, Washington Post (Mar. 29, 2020).

[8] https://www.bop.gov/coronavirus/ (last visited May 19, 2020). BOP reports that 40 BOP facilities and 9 RRCs nationwide have been affected. *Id.*

[9] A copy of the report is available at https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf.

[10] See footnote 8.

Courts in this District have recognized the dire risk posed by the virus and, among other measures, have released pretrial detainees to mitigate their risk of severe illness or death. See, e.g., *United States v. Greenan*, No. 1:19-cr-10327-ADB, Dkt. No. 44 (D. Mass. April 14, 2020) (releasing defendant with no underlying medical conditions from Wyatt Detention Facility over government objection); *United States v. Ramos*, No. 3:18-cr-30009-FDS, Dkt. No. 168 (D. Mass. March 26, 2020) (releasing diabetic defendant pending trial on drug conspiracy charges, despite oral objection from government); *United States v. Camara*, No. 1:19-cr-10442-IT-1, Dkt. No. 49 (D. Mass. March 27, 2020) (releasing defendant with COPD pending trial on theft of government money and false statements charges, with assent from government); *United States v. Webster*, No. 19-cr-211-JL, Dkt. No. 32 (D.N.H. April 1, 2020) (releasing defendant with underlying health conditions pending trial on drug distribution charges, over government objection); *United States v. Rodriguez*, No. 1:20-mj-06145-MPK-1, Dkt. No. 17 (D. Mass. April 1, 2020) (releasing defendant with underlying health conditions over government objection); *United States v. Miranda*, No. 1:19-cr-10446-RGS-3, Dkt. No. 57 (D. Mass. April 7, 2020) (in drug conspiracy case, granting pre-trial release for defendant with asthma over government objection); *United States v. Doe*, No. 4:19-cr-40030-TSH, Dkt. No. 71 (D. Mass. April 6, 2020) (with government's assent, and against probation's recommendation, releasing 75 year old defendant with some underlying health conditions pending trial on false statement in passport application and aggravated ID theft charges); *United States v. Torres*, No. 1:19-cr-10421-DPW, Dkt. No. 147 (D. Mass. April 8, 2020) (with government's assent, releasing defendant with heart and respiratory conditions pending trial on drug conspiracy charges); *United States v. Nieves*, No. 1:19-cr-10459-RWZ, Dkt. No. 693 (D. Mass. April 8, 2020) (releasing defendant with cystic fibrosis and asthma over government objection); *United States v. Nunez*, No. 1:19-cr-10316-LTS, Dkt. No.

84 (D. Mass. April 10, 2020) (releasing defendant with no medical issues from Wyatt over objection by the government and probation); *United States v. Torres*, No. 4:19-cr-40046, Dkt. No. 75 (D. Mass. April 14, 2020) (with government's assent, releasing defendant with heart condition from Wyatt pending trial on drug charges); *United States v. Shaba*, No. 1:20-mj-00011-PAS, Dkt. No. 22 (D.R.I. April 10, 2020) (releasing defendant with high blood pressure pending trial on wire fraud and money laundering, over government objection); *United States v. Torres*, No. 1:20-cr-00005-MSM-LDA (D.R.I. April 30, 2020) (releasing asthmatic defendant from Wyatt over government objection); *United States v. Felix-Rivera*, No. 19-CR-10459-RWZ, Dkt. No. 766 (D. Mass. April 22, 2020) (releasing defendant with asthma); *United States v. Cordova*, No. 4:19-cr-40025-TSH, Dkt. No. 128 (D. Mass. May 1, 2020) (release on $10,000 unsecured bond with condition of EM house arrest, where defendant had no underlying medical conditions, facing 10 year mm, career offender, and had previously agreed to voluntary detention); *United States v. Le*, No. 1:19-cr-10199-RWZ, Dkt. No. 103 (D. Mass. May 7, 2020) (upholding decision to release pretrial detainee, who had no underlying medical conditions, from Wyatt); *United States v. Martinez*, No. 1:19-cr-10348-RGS, Dkt. No. 42 (D. Mass. May 11, 2020) (releasing defendant with underlying medical issues from Wyatt).

Courts are also releasing individuals after conviction, including those who have begun serving their sentences. *See United States v. Grobman*, No. 18-cr-20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (post-plea

presentence release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is *necessary* for Defendant to prepare his pre-sentence defense"); *United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic").

Courts have recognized that there is no greater necessity than keeping a defendant alive, no matter the charge. As one court reflected: "When we do punish, we do not act cruelly." *United States v. Scarpa*, 815 F.Supp. 88, 93 (E.D.N.Y. 1993) (defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"). Even for those already in custody, release may be appropriate to safeguard a defendant's health and life. *See, e.g*, *id*.; *see also United States v. Cordero Caraballo*, 185 F. Supp. 2d 143, 146 (D.P.R. 2002). DOJ itself recognizes this urgency; as this Court noted in its ruling in *Grinis et al. v. Spaulding*, "The Attorney General has instructed BOP facilities to transfer appropriate qualifying inmates from institutional incarceration to home confinement pursuant to the recently enacted 'CARES Act,' P.L. 116-136, 134 Stat. 281 (Mar. 27, 2020)." *Grinis et al. v. Spaulding*, Civ. No. 20-10738-GAO, OPINION AND ORDER (May 8, 2020).

Considerations about the risks of committing a person to BOP's custody should enter into a sentencing determination during these difficult times.

VII.   The Appropriate Sentence

Mr. Chan, now 43 years old, faces sentencing for his first offense. He held no ownership in the bus company, and had been working at the time as an office clerk and driver at modestly more than the minimum wage. In his past, he volunteered as an auxiliary police officer in New York until he moved with his family to Massachusetts. His guideline is in Zone B of the Guidelines, which ordinarily calls for a probationary sentence. USSC §5B1.1. He is repentant as has been shown in his respectful attendance at court as well as in his compliance with his release conditions. Finally, there is the undeniable health risk posed by a committed sentence in a BOP facility, even if a committed sentence would be deferred for a time. As the District Court in

Northern California noted: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided." See, *supra* at 13.

For the reasons set out above, defendant urges a sentence of probation for one year.

Respectfully submitted,

Yat Kuen Chan
By his attorney,

*/s/ Charles P. McGinty*
Charles P. McGinty
B.B.O. #333480
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 21, 2020.

*/s/ Charles P. McGinty*
Charles P. McGinty